**OUTDOOR SYSTEMS, INC., Plaintiff,**

v.

**The CITY OF MERRIAM, KANSAS, Defendant.**

**No. Civ.A. 98–2397–KHV.**

United States District Court, D. Kansas.

Aug. 30, 1999.

Edward R. Spalty, Armstrong Teasdale LLP, Kansas City, MO, David H. Flint, Mark W. Forsling, Schreeder, Wheeler & Flint, LLP, Atlanta, GA, for Plaintiff.

Lynaia M. Holsapple, Holbrook, Heaven & Osborn, P.A., Kansas City, KS, John D. Tongier, Holbrook, Heaven & Osborn, P.A., Merriam, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Outdoor Systems, Inc. is an outdoor advertising company which leases billboards throughout the Kansas City metropolitan area. It filed suit against the City of Merriam, Kansas, a suburb of Kansas City, alleging that its sign ordinance is unconstitutional. This matter is before the Court on *Plaintiff's Motion For Summary Judgment* (Doc. # 13) filed March 1, 1999 and *Defendant's Cross Motion For Summary Judgment* (Doc. # 19) filed April 8, 1999. After carefully considering the parties' briefs, the Court is prepared to rule. For reasons set forth below, both motions are sustained in part and overruled in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

The following facts are uncontroverted or deemed admitted for purposes of the instant motions.

Outdoor Systems, Inc. is a Delaware corporation which conducts an outdoor advertising business in the metropolitan Kansas City area, including the City of Merriam, Kansas. The City has enacted zoning regulations which govern, *inter alia,* the erection and maintenance of on-premise, off-premise, political and other signs within the city.

Plaintiff wants to construct permanent off-premise outdoor advertising signs on

property which is zoned for commercial and industrial uses. These signs would direct attention to businesses, commodities, services or entertainment conducted, sold or offered at locations other than the premises on which they would be located or affixed. Also, they would provide information to the public about goods, products, services, establishments, ideas and events. In other words, they would provide a medium for commercial, political and noncommercial speech. Plaintiff would post or paint messages on the signs, and it would periodically change them.

The ordinance does not specifically prohibit offsite signs but it states that only certain categories of signs (which do not include offsite outdoor advertising signs) are permitted. Sections 6–201 through 6–203 allow the following signs in all business, industrial and residential districts:

1. BULLETIN BOARD SIGN: A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it and announcement of persons, events or activities occurring at the institution. Such signs may also present a greeting or similar message.

2. BUSINESS SIGN: A sign which directs attention to a business or profession conducted or to a commodity or service sold, offered or manufactured or an entertainment offered, on the premises where the sign is located or to which it is affixed.

3. CONSTRUCTION SIGN: A temporary sign indicating the name of architects, engineers, landscape architects, contractors and similar artisans involved in the design and construction of a structure or project, permitted only during the construction period and only on the premises on which the construction is taking place.

4. IDENTIFICATION SIGN: A sign giving the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

5. NAME PLATE SIGN: A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located and where applicable, a professional status.

6. REAL ESTATE SIGN: A sign pertaining to the sale or lease of the lot or tract of land on which the sign is located or to the sale or lease of one or more structures or a portion thereof located thereon.

Sign Ordinance § 6–107(A); see id. §§ 6–201, 6–202, 6–203. In business and industrial districts, the ordinance also permits advertising signs, which are defined as follows: "A sign which directs attention to a business, commodity, service or entertainment conducted, sold or offered at the location on which the sign is located or to which it is affixed." See id. § 6–107(A)(1).

An individual may not erect, repair, alter, relocate or maintain any sign without first paying a fee and obtaining a sign permit from the City Zoning Administrator. See id. § 6–103. Section 6–103(B)(2) of the ordinance provides that the Community Development Director may not issue any sign permit (other than a temporary permit) without the prior approval of a majority of a quorum of the members of the Community Development Committee. The Sign Ordinance provides that a permit should be issued if the "application is in order." See id. § 6–103(B). The City Zoning Administrator may also remove signs if he finds them to be "unattractive" or a "menace to the public." See id. § 6–103(F)(1). The ordinance requires that "all signs shall conform, generally, to the aesthetics of the immediate area in which they are placed." See id. § 6–104(I). The ordinance does not define "aesthetics" or explain how city officials should deter-

mine if a sign conforms to the aesthetics of the surrounding area.

The ordinance exempts the following signs from its regulations: real estate signs below a certain size and for a limited period; professional name plate signs; bulletin boards not over eight square feet located on the premises of public, charitable or religious institutions; signs denoting the architect, engineer or contractor of work; occupational signs; memorial signs; traffic or other municipal signs; flags; holiday decorations; house numbers and name plates; and signs located inside a building. *See id.* § 6–105(A).

The ordinance also permits temporary signs to be displayed for up to 30 days in any one calendar year but not in two consecutive months. *See id.* § 6–104(N). Advertisements on temporary signs must pertain to the business conducted on the premises unless the sign is of a civic, political or religious nature. *See id.* Political signs "may be erected no sooner than twenty-five (25) days before an election and shall be removed no later than five (5) days after an election." *See id.* § 6–104(N)(5)(d).[1]

Section 6–104(H) of the ordinance provides that "it shall be unlawful for any person to display upon any sign or other advertising structure any obscene, indecent or immoral matter." The ordinance does not define the type of matter deemed "obscene, indecent or immoral."

Section 6–106(A) of the ordinance provides that "every sign or other advertising structure lawfully in existence on the adoption of this ordinance shall not be altered unless it be made to comply with the provisions of these Regulations."

Plaintiff alleges that the sign ordinance violates the First Amendment to the United States Constitution and Section 11 of the Kansas Bill of Rights because it favors commercial speech over noncommercial speech, it impermissibly distinguishes between types of noncommercial speech based on content, and it allows the Community Development Committee, the City Zoning Administrator, and other city officials to remove signs in the exercise of unfettered discretion. Plaintiff also alleges that the ordinance is an unconstitutional taking of property without due process because it terminates non-conforming signs whenever such signs are altered. Defendant contends that the ordinance is content-neutral and therefore a proper time, place and manner restriction. Defendant also maintains that no city official reviews a sign application based on the content of the message and that no official has unfettered discretion to remove a sign. Both parties seek summary judgment on all claims, based on the undisputed facts.

### Analysis

#### I. Restrictions On Noncommercial Speech

■ Signs are a form of expression protected by the First Amendment.[2] *See City of Ladue v. Gilleo,* 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). The Supreme Court has noted, however, that signs carrying noncommercial messages are entitled to a higher degree of protection than those carrying commercial messages. *See Metromedia, Inc. v. San Diego,* 453 U.S. 490, 506–07, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Plaintiff alleges that the ordinance impermissibly distinguishes between types of noncommercial speech

---

1. The ordinance also restricts the size, number and location of political signs. *See id.* § 6–104(N)(5). These additional restrictions are not at issue in this case.

2. Plaintiff challenges the ordinance under both the First Amendment and Section 11 of the Kansas Bill of Rights. Courts generally apply the same analysis to these two constitutional provisions. *See Case v. Unified School Dist. No. 233,* 908 F.Supp. 864, 876 (D.Kan. 1995) (citing *Unified School Dist. No. 503 v. McKinney,* 236 Kan. 224, 234–35, 689 P.2d 860 (1984)); *State v. Russell,* 227 Kan. 897, 899, 610 P.2d 1122, *cert. denied,* 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980)). Accordingly, the Court will apply federal case law to both free speech provisions.

based on content.[3] Defendant maintains that the distinctions are viewpoint neutral and permissible under the First Amendment. To determine the constitutional validity of the ordinance's restrictions on noncommercial speech, the Court must determine whether the restrictions are content-based or content-neutral. *See Rappa v. New Castle County,* 18 F.3d 1043, 1053 (3d Cir.1994). Based on the answer to that inquiry, the Court must apply the appropriate level of scrutiny. *See id.*

 If a statute is content-based, the Court must apply strict scrutiny. The statute will be upheld only if it is necessary to serve a compelling state interest and narrowly drawn to achieve that end. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). On the other hand, time, place and manner restrictions are constitutional provided that they are "justified without reference to the content of the regulated speech," they are narrowly tailored to serve a significant governmental interest, and "they leave open alternate channels for communication of the information." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

A. *Content–Based Or Content–Neutral Regulation*

 The critical inquiry is whether the ordinance categorizes permissible noncommercial signs by reference to the content of the messages conveyed. In *Metromedia,* the Supreme Court addressed whether a sign ordinance (similar to the one enacted by the City of Merriam) was content-neutral. In *Metromedia,* the city ordinance generally prohibited outdoor advertising display signs, *see id.* at 493–94, 101 S.Ct. 2882, but made exceptions for on-site signs; government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and temporary political campaign signs. *Id.* at 494–95, 101 S.Ct. 2882. Under the scheme, on-site commercial advertising was permitted, but other commercial advertising and noncommercial communications using fixed-structure signs were everywhere forbidden unless permitted by one of the specified exceptions. *See id.* at 495–96, 101 S.Ct. 2882. The sign ordinance therefore distinguished permissible and impermissible signs at a particular location based on the message conveyed by the sign. *See id.* at 516–17, 101 S.Ct. 2882. A four-member plurality of the Supreme Court held that this type of regulation was content-based and subject to strict scrutiny.[4] *See id.* at 515–17 & n. 23, 101 S.Ct. 2882.

3. Plaintiff also argues that the ordinance is unconstitutional because it favors commercial speech over noncommercial speech. The Court need not consider this argument because it finds that plaintiff's primary argument, noted above, is dispositive.

4. The other five Justices analyzed the exceptions to the San Diego ordinance quite differently. Chief Justice Burger, dissenting, stated that "content-neutral" and "content-based" labels are not really relevant. *See id.* at 557. He articulated a test, however, which relied almost exclusively on prior cases that evaluated time, place and manner restrictions. *See id.* at 517 n. 23, 557–65. He characterized

the exemptions for certain signs in the San Diego ordinance as "negligible." *See id.* at 562. Justice Rehnquist agreed substantially with Chief Justice Burger. *See id.* at 569. Justices Brennan and Blackmun, concurring in the judgment, thought that the San Diego ordinance should be viewed as a content-neutral prohibition of a particular media of communication, *i.e.* all offsite billboards. *See id.* at 526–27. Justice Stevens, dissenting in part, stated that since a total ban on billboards would be permissible, the content-neutral exceptions in the San Diego ordinance did not threaten the interests protected by the First Amendment. *See id.* at 553. He reasoned that the exceptions did not show that

The Merriam ordinance similarly permits onsite [5] signs (both commercial and noncommercial) but offsite commercial and noncommercial signs are prohibited unless they satisfy one of the specified exceptions. Although neither party has attempted to discuss each category of signs which may impact noncommercial speech, the Court finds that the ordinance allows noncommercial speech to some extent on the following signs: advertising signs, bulletin board signs; business signs; identification signs; name plate signs; temporary signs of a civic, political or religious nature; occupational signs; memorial signs; certain flags; holiday decorations; and signs located inside a building. *See* Sign Ordinance §§ 6–104(N), 6–105(A), 6–107(A). Except for inside signs,[6] the city must evaluate the content of the sign to determine whether it is allowed under these provisions. Common sense dictates that these distinctions are content-based because "determining whether a sign may stay up or must come down requires consideration of the message it carries." *Ackerley Communications of Mass., Inc. v. City of Cambridge*, 88 F.3d 33, 36 n. 7 (1st Cir.1996) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427–31, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)); *see Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."); *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir.1996) (regulation is content based if officials must examine sign content to determine whether exception applies), *cert. denied*, 522 U.S. 912, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997); *Whitton v. City of Gladstone*, 54 F.3d 1400, 1403–04 (8th Cir. 1995) ("The Supreme Court has held that a restriction on speech is content-based when the message conveyed determines whether the speech is subject to the restriction."); *National Adver. Co. v. Town of Babylon*, 900 F.2d 551, 556–57 (2d Cir. 1990) (exceptions for political signs and signs identifying a grand opening, parade, festival, fund drive or other similar occasion were content-based), *cert. denied*, 498 U.S. 852, 111 S.Ct. 146, 112 L.Ed.2d 112 (1990). *But see Rappa v. New Castle County*, 18 F.3d 1043, 1067 (3d Cir.1994); *Messer v. City of Douglasville*, 975 F.2d 1505, 1509 (11th Cir.1992), *cert. denied*, 508 U.S. 930, 113 S.Ct. 2395, 124 L.Ed.2d 296 (1993).[7]

The City of Merriam contends that the ordinance does not limit the content of noncommercial messages because bulletin board signs may present a "greeting or similar message." Sign Ordinance § 6–107(A)(2). A "greeting" is commonly understood to mean "an expression of kindness or joy: a salutation at meeting or a

---

San Diego was attempting to influence public opinion or to limit public debate on particular issues—the traditional dangers of content-based regulations. *See id.* at 554–55.

**5.** The term onsite is not actually used in the Merriam ordinance. Rather, the term describes the requirement that a sign relate to the property (or to some specific portion of the property) on which the sign is located. Most of the sign classifications contain this requirement. *See, e.g.,* Sign Ordinance § 6–107(A)(1) (advertising sign directs attention to business, commodity, service or entertainment on the premises); § 6–107(A)(6) (name plate sign gives the name and/or address of owner or occupant of building or premises on which the sign is located).

**6.** The exemption for signs located inside a building appears to be content-neutral and does not indicate a preference for either commercial or noncommercial messages. This provision appears to be reasonable time, place and manner restriction. It likely would survive constitutional scrutiny if the ordinance could otherwise be upheld.

**7.** In *Messer*, the Eleventh Circuit held that an ordinance which allows onsite noncommercial signs but prohibits offsite noncommercial signs is permissible because it is viewpoint neutral. *See Messer*, 975 F.2d at 1509 (ordinance "regulates signs not based on the viewpoint of the speaker, but based on the location of the signs"). For the reasons stated in the following section, the Court declines to follow *Messer*.

compliment from one absent." Webster's Third New Int'l (Unabridged) Dictionary (1986) at 998. In the context of a sign, a greeting means a salutation such as "hello" or "have a nice day." A sign urging citizens to "Vote Republican" or stating that "Abortion is murder" is not included within the common meaning of a "greeting or similar message." If the City truly intends to allow noncommercial messages of any type on bulletin boards, it may amend its ordinance to specifically reflect its intent. As written, the exception for bulletin board signs is limited to a certain type of noncommercial speech. Thus it does not transform the ordinance into a content-neutral regulation.[8]

In the alternative, defendant argues that the ordinance may be construed to be content-neutral with respect to noncommercial speech because such speech may be classified as "onsite" (*i.e.* directing attention to the property on which the sign is located). *See* Defendant's *Memorandum In Opposition To Plaintiff's Motion For Summary Judgment And In Support Of Defendant's Cross–Motion For Summary Judgment* (Doc. # 19) filed Apr. 8, 1999, at 10–11 (citing *Southlake Property Assocs., Ltd. v. City of Morrow,* 112 F.3d 1114 (11th Cir. 1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998)). *In Southlake,* the ordinance specifically prohibited billboards defined as any "sign which advertises a commodity, product, service, activity or any other person, place or thing, which is not located, found or sold on the premises upon which such sign is located." 112 F.3d at 1117. The Eleventh

Circuit held that noncommercial messages do not fall within this prohibition because "a sign bearing a noncommercial message is onsite wherever the speaker places it." *Id.* at 1118.

The Merriam Sign Ordinance is significantly different, however, from the one upheld in *Southlake Property.* First, unlike the ordinance in *Southlake Property,* the Merriam ordinance does not specifically prohibit "offsite" signs. Rather, it permits various types of functional and structural signs such as those which direct "attention to a business, commodity, service or entertainment conducted, sold or offered at the location on which the sign is located or to which it is affixed." Sign Ordinance § 6–107(A)(1). The issue here is whether the ordinance allows noncommercial speech (*i.e.* whether it falls within any of the definitions of the functional signs which the ordinance permits). The City of Merriam has not shown that its ordinance allows all noncommercial speech. A common sense reading of the ordinance reveals that a sign placed on Main Street which reads "Attend Political Rally on State Street" does not direct attention to a business, commodity, service or entertainment on the premises where the sign is located. In a similar fashion, a sign placed on the premises of a widget factory which states "God saves" does not fall within any category of permanent signs which are allowed by the ordinance. Not all noncommercial speech is permitted under the Merriam ordinance. *See City of Cambridge,* 88 F.3d at 39 (most

---

**8.** Defendant also argues that the ordinance is content-neutral because all billboard signs are prohibited whether they advertise an on-premise subject or not. Defendant fails to cite any provision of the ordinance to justify this position. Defendant's position is irreconcilable with a number of the ordinance provisions, which allow on-premise advertisement but omit any reference to, and therefore prohibit, off-premise advertising. *See* Sign Ordinance § 101 (ordinance "prohibits all forms of off-premise signs"); *id.* § 6–107(A)(1) (signs which direct attention to on-premise subject permitted); *id.* § 6–107(A)(3) (same). Defendant's conflicting view of the ordinance

apparently arises from its use of the term "billboards." Defendant initially defines a billboard as an off-premise outdoor advertising signs, but later refers to billboards which advertise on-premise subjects. *See* Defendant's *Memorandum In Opposition To Plaintiff's Motion For Summary Judgment And In Support Of Defendant's Cross–Motion For Summary Judgment* (Doc. # 19) filed Apr. 8, 1999, at 6–7. Except for a limited reference in the definition of a sign, the ordinance generally does not use the term billboard. *See* Sign Ordinance § 6–102(A)(1). Accordingly, the Court will refer to the sign classifications which are actually used in the ordinance.

noncommercial signs are "offsite"); *see also National Advertising*, 912 F.2d at 409 (upholding ordinance which limited prohibition of offsite signs to commercial messages).

In sum, the Merriam ordinance is similar to the one in *Metromedia* where "onsite commercial advertising is permitted, but other commercial advertising and noncommercial communications using fixed-structure signs are everywhere forbidden unless permitted by one of the specified exceptions." 453 U.S. at 495–96, 101 S.Ct. 2882. The ordinance is a content-based regulation of signs because the determination whether a sign is permissible depends on the type of message it conveys.

### B. *Validity Of Content–Based Restrictions In The Merriam Ordinance*

■ To be valid under the First Amendment, a content-based regulation must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. *See Simon & Schuster*, 502 U.S. at 118, 112 S.Ct. 501; *Boos*, 485 U.S. at 321, 108 S.Ct. 1157. In *Metromedia*, the Supreme Court applied this strict scrutiny test to the San Diego sign ordinance. The Court held that San Diego could choose to value one kind of commercial speech (onsite advertising) more than another kind of commercial speech (offsite advertising). *See Metromedia*, 453 U.S. at 512, 101 S.Ct. 2882. It stated that "the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere." *Id.* In other words, San Diego did not have to treat all commercial interests equally. *See id.*

The Supreme Court took a quite different view, however, of San Diego's restrictions on noncommercial speech. A plurality of the Court noted that "[t]he fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others." *Id.* at 513, 101 S.Ct. 2882. San Diego's ordinance contained a broad exception for onsite commercial advertisements, but it omitted a similar exception for all noncommercial speech. *See id.* Because noncommercial speech is entitled to greater protection than commercial speech, the Supreme Court held that the city could not conclude that the communication of commercial information was entitled to greater protection than noncommercial information. *See id.* The Court stated:

> Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests. *See Carey v. Brown*, 447 U.S. at 462, 100 S.Ct. at 2291; *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated Edison Co.*, 447 U.S. at 538, 100 S.Ct. at 2333. Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.

*Id.* at 514–15, 101 S.Ct. 2882. The Supreme Court concluded that San Diego's ordinance reached too far into the realm of protected speech by only permitting certain types of noncommercial speech. *See id.* at 521, 101 S.Ct. 2882. In other words, the ordinance was not narrowly tailored to achieve a compelling state interest.

The Merriam ordinance suffers the same constitutional deficiency, *i.e.* it permits onsite commercial signs and a limited category of noncommercial signs. The City has attempted to permit certain types of noncommercial speech, *e.g.* onsite signs and holiday decorations, while prohibiting others, *e.g.* permanent offsite signs. Likewise, by restricting civil, political and religious speech to signs which may not be displayed more than 30 days in one year, the City has placed greater value on onsite speech (both commercial and noncommercial) than civic, political and religious speech. Defendant has not attempted to justify its restrictions on noncommercial speech under the strict scrutiny standard. Defendant has not identified any compelling state interest for an ordinance which allows commercial signs regarding an onsite subject but prohibits offsite noncommercial signs and significantly restricts political and religious signs. Defendant has not shown, or even argued, any aesthetic or traffic safety distinction between these various types of signs. The Court is not aware of any aesthetic or traffic safety difference between a "Vote for Joe" sign (which is restricted to 30 days) and a "Joe's Pizza" sign (which may be permanent). The ordinance limits the subjects and duration of many types of noncommercial signs while it allows permanent onsite commercial advertising signs. Defendant has failed to show that the ordinance's restrictions on speech are narrowly tailored to achieve a compelling state interest. Accordingly, the Court finds that these provisions do not survive strict scrutiny under the First Amendment. *See Metromedia,* 453 U.S. at 514–15, 101 S.Ct. 2882 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse"); *see Ackerley,* 88 F.3d at 37 ("But with rare exceptions, the First Amendment does not permit Cambridge to value certain types of noncommercial speech more highly than others") (footnote omitted); *Union City*

*Bd. of Zoning Appeals v. Justice Outdoor Dispays, Inc.,* 266 Ga. 393, 396, 467 S.E.2d 875(1996) (municipality cannot place a higher value on a particular category of noncommercial speech).

Defendant, relying on *Messer v. Douglasville, supra,* claims that the implicit onsite / offsite distinction [9] in its ordinance does not discriminate against noncommercial speech because not all offsite billboards are noncommercial and not all onsite billboards are commercial. In *Messer,* the court reasoned:

> A noncommercial enterprise would be able to put up a sign bearing a noncommercial message as long as it relates to any activity on the premises. Similarly, a commercial enterprise would be able to put up a sign bearing a noncommercial message which related to any activity on the premises. For example, an auto mechanic's garage would be able to put up a noncommercial message relating to the recycling of used motor oil.

*Id.* This analysis ignores the fact that noncommercial speech is entitled to a higher degree of protection than commercial speech. *See Metromedia,* 453 U.S. at 506–07, 513, 101 S.Ct. 2882; *Central Hudson,* 447 U.S. at 562–63, 100 S.Ct. 2343; *see also Union City,* 467 S.E.2d at 880 (rejecting reasoning of *Messer* ). In other words, the auto mechanic should be able to display any noncommercial message, not solely one restricted to automobiles or the materials used in them. Likewise, a noncommercial entity should be able to display any noncommercial message, not only one limited to an activity it conducts on the premises. We find persuasive the reasoning of the First Circuit:

> if the owner of Joe's Hardware wants to replace his "Joe's Hardware" sign with a sign saying "No Nukes," he must be allowed to do so. This result follows logically from the First Amendment's value structure; if a commercial mes-

---

**9.** As explained above, the term onsite is not actually used in the Merriam ordinance. *See*

*supra* note 5.

sage overrides the city's aesthetics and safety interests, any message that is at least as important in the First Amendment hierarchy also must override those interests. Because noncommercial speech is entitled to a higher degree of protection than commercial speech, San Diego could not decide that its aesthetic and safety interests were outweighed by the need to express commercial messages but not by the need to express noncommercial messages.

*Ackerley Communications of Mass., Inc. v. City of Somerville,* 878 F.2d 513, 517 (1st Cir.1989).

The First Circuit applied similar reasoning in *Ackerley Comm'ns of Mass., Inc. v. City of Cambridge,* 88 F.3d 33, 37 (1st Cir.1996). The court held that the Cambridge ordinance impermissibly favored onsite noncommercial speech over offsite noncommercial speech. *Id.* at 37–38. Cambridge argued that on-premise signs play an important role in promoting activities which are important to the well-being of the city. *Id.* at 37. The First Circuit rejected this distinction with respect to noncommercial speech. The court stated that "with rare exceptions, the First Amendment does not permit Cambridge to value certain types of noncommercial speech more highly than others." *Id.* The court further noted that Cambridge had not shown any aesthetic difference between a "Remember to Vote" message and one announcing the location of a public library. *See id.* at 38.

Merriam's durational restriction on political and other temporary signs in residential areas is particularly troubling. In *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), the Supreme Court analyzed a city ordinance which prohibited homeowners from displaying any signs on their property, except those within certain exemptions such as residence identification signs, for sale signs, and signs warning of safety hazards. The City of Ladue found plaintiff in violation of the ordinance because she posted a sign in the window of her home, stating "For Peace in the Gulf." *Id.* at 45, 114 S.Ct. 2038. The Supreme Court emphasized the important and unique nature of residential signs as a means of expression:

Here, in contrast, Ladue has almost completely foreclosed a venerable means of communication that is both unique and important. It has totally foreclosed that medium to political, religious, or personal messages. Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community. Often placed on lawns or in windows, residential signs play an important part ·in political campaigns, during which they are displayed to signal the resident's support for particular candidates, parties, or causes. They may not afford the same opportunities for conveying complex ideas as do other media, but residential signs have long been an important and distinct medium of expression . . . .

Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute. *Cf. Vincent,* 466 U.S., at 812–813, n. 30, 104 S.Ct., at 2132–2133, n. 30; *Anderson v. Celebrezze,* 460 U.S. 780, 793–794, 103 S.Ct. 1564, 1572–1573, 75 L.Ed.2d 547 (1983); *Martin v. City of Struthers,* 319 U.S., at 146, 63 S.Ct., at 865; *Milk Wagon Drivers v. Meadowmoor Dairies, Inc.,* 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836 (1941). Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a handheld sign may make the difference between participating and not participating in some public debate. Furthermore, a person who puts up a sign at her residence often intends to reach neighbors, an audience that could not be reached nearly as well by other means.

*Id.* at 54–55, 57, 114 S.Ct. 2038 (footnotes omitted).

The Supreme Court also noted that a locality's interest in aesthetics or traffic safety will rarely override a citizen's right to free speech on his or her own property:

A special respect for individual liberty in the home has long been part of our culture and our law, *see, e.g., Payton v. New York,* 445 U.S. 573, 596–597, 100 S.Ct. 1371, 63 L.Ed.2d 639, and Nord. 44–45, 445 U.S. 573, 100 S.Ct. 1371, 1385–1386, and Nord. 44–45, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); that principle has special resonance when the government seeks to constrain a person's ability to speak there. *See Spence v. Washington,* 418 U.S. 405, 406, 409, 411, 94 S.Ct. 2727, 2728, 2729–2730, 41 L.Ed.2d 842 (1974) (per curiam). Most Americans would be understandably dismayed, given that tradition, to learn that it was illegal to display from their window an 8– by 11– inch sign expressing their political views. Whereas the government's need to mediate among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable, *see Cox v. New Hampshire,* 312 U.S. 569, 574, 576, 61 S.Ct. 762, 765, 765, 85 L.Ed. 1049 (1941); *see also Widmar v. Vincent,* 454 U.S. 263, 278, 102 S.Ct. 269, 278–279, 70 L.Ed.2d 440 (1981) (STEVENS, J., concurring in judgment), its need to regulate temperate speech from the home is surely much less pressing, *see Spence,* 418 U.S., at 409, 94 S.Ct., at 2729–2730.

.... It bears mentioning that individual residents themselves have strong incentives to keep their own property values up and to prevent "visual clutter" in their own yards and neighborhoods—incentives markedly different from those of persons who erect signs on others' land, in others' neighborhoods, or on public property. Residents' self-interest diminishes the danger of the "unlimited" proliferation of residential signs that concerns the City of Ladue. We are confident that more temperate measures could in large part satisfy Ladue's stated regulatory needs without harm to the First Amendment rights of its citizens. *Id.* at 58–59, 114 S.Ct. 2038. Nearly every court to address the issue has held that the government interest in aesthetics and safety is insufficient to justify a durational restriction on political signs in residential districts. *See, e.g., Whitton,* 54 F.3d at 1408–09; *Curry v. Prince George's County, Md.,* 33 F.Supp.2d 447, 454–55 (D.Md. 1999); *Union City,* 467 S.E.2d at 882; *McCormack v. Township of Clinton,* 872 F.Supp. 1320, 1325 n. 2 (D.N.J.1994) ("no court has ever held that [aesthetics and traffic safety] form a compelling justification for a content-based restriction on political speech"). The Court finds that Merriam's durational restriction on political and other temporary signs is similarly deficient.

After the Supreme Court's decision in *Metromedia,* many localities amended their ordinances to allow noncommercial messages wherever commercial messages were permitted. *See, e.g., Outdoor Sys., Inc. v. City of Mesa,* 997 F.2d 604, 611 (9th Cir.1993); *National Adver. Co. v. City & County of Denver,* 912 F.2d 405, 408–10 (10th Cir.1990); *Town of Babylon,* 900 F.2d at 556–57. The City of Merriam did not adopt such an ordinance. Rather, it has provided exceptions for limited types of noncommercial speech such as temporary civic, political and religious signs, certain bulletin board signs, and holiday decorations. These exceptions illustrate that the ordinance favors certain types of noncommercial speech over others. As noted above, a city "may not choose the appropriate subjects for public discourse." *Metromedia,* 453 U.S. at 515, 101 S.Ct. 2882.

Finally, plaintiff argues that the ordinance restricts political signs to residential zoning districts in violation of the First Amendment. The City contends that political signs are allowed in all zoning districts. Section 6–104(N)(5) appears to permit political signs in all districts. Sections 6–202 and 6–203 appear to prohibit such signs in business and industrial districts.

*See* Sign Ordinance § 6–104(N)(5) (political signs may be erected on private property without specifying any particular zoning districts); § 6–201(A)(6) (allows political signs in residential districts); §§ 6–202, 6–203 (any type of sign listed in § 6–107(A), which does not list political signs, is allowed in business and industrial districts). Where a statute may reasonably be read two different ways, the Court's duty is to adopt the construction which upholds the statute. *See Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 1222, 143 L.Ed.2d 311 (1999); *State v. Unified Gov't of Wyandotte County/Kansas City, Kan.,* 264 Kan. 293, 300, 955 P.2d 1136, 1145–46 (1998).

Although the ordinance is not a model of legislative clarity, the Court finds that political signs are treated as "other temporary signs" and are allowed in all zoning districts provided that they are not on public property, utility poles or trees and they comply with the requirements of Section 6–104(N)(5). *See id.* § 6–104(N)(5) (listing additional restrictions on political signs such as size and location on lot). Section 6–201(A) merely lists additional restrictions on political signs in residential districts. Although Sections 6–202 and 6–203 do not specifically allow political signs in business and industrial districts, they do not necessarily preclude such signs. Moreover, Section 6–104(N)(5)(b) specifically contemplates that political signs may be placed in all zoning districts. *See id.* ("In residential zoning districts each sign

face shall not exceed 2.5 square feet. In all other zoning districts each sign face shall not exceed 32 square feet."); *see also id.* § 6–104(N)(5) (political signs allowed on private property). Given that the ordinance permits political signs in all zoning districts, the Court need not decide whether an ordinance may limit political signs to residential districts only.[10]

In summary, the Court finds that Sections 6–104(N), 6–105, 6–107(A), 6–201, 6–202, and 6–203 of the Merriam Sign Ordinance are unconstitutional.[11] Plaintiff's motion for summary judgment on this issue is sustained and defendant's motion is overruled.

## II. Discretion Of Community Development Committee

■ An ordinance that requires a permit before a sign may be displayed cannot grant a government official unfettered discretion to deny a permit application. *See City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 772, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (citing *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). Limits on the administrator's authority must be imposed either by explicit "textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138. Moreover, a prior restraint upon the issuance of sign permits must place limits on the time within which the decisionmaker

---

**10.** Although the Court finds that political signs are permitted in all zoning districts under the current ordinance, the City may wish to clarify this point if and when it redrafts the ordinance.

**11.** These provisions violate the First Amendment principles enunciated in *Metromedia* because the ordinance (unlike many sign ordinances) does not allow noncommercial speech to be substituted in lieu of the various categories of permitted speech. *Cf. Outdoor Sys., Inc. v. City of Lenexa,* 67 F.Supp.2d 1231 (finding permissible ordinance stating that "any permitted sign is allowed to contain noncommercial speech in lieu of any other

speech") (D.Kan. July 26, 1999); *Outdoor Sys., Inc. v. City of Mesa,* 997 F.2d 604, 611 (9th Cir.1993) (ordinances which allow noncommercial messages in lieu of any other message satisfy free speech requirements); *National Adver. Co. v. City & County of Denver,* 912 F.2d 405, 408–10 (10th Cir.1990) ("the preference for noncommercial over commercial advertising under the new ordinance is the kind of underinclusiveness the First Amendment tolerates"); *Georgia Outdoor Adver., Inc. v. City of Waynesville,* 833 F.2d 43, 46 (4th Cir.1987) (upholding ordinance similar to ones in *City of Mesa, supra*). The City could likely save this portion of the ordinance by adding such a provision.

must issue a license. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Freedman,* 380 U.S. at 59, 85 S.Ct. 734.

■ Here, the Zoning Administrator first reviews permit applications for compliance with certain standards and guidelines. *See* Merriam Code § 6–103(B)(1). Within 30 days of the application, the Zoning Administrator must submit each application to the Community Development Committee (the "Committee") of the City Council. *See id.* § 6–103(B)(2). The Committee reviews the application at its next regularly scheduled monthly meeting.

Plaintiff argues that the ordinance is unconstitutional because it grants the Committee unfettered discretion to issue sign permits and does not contain a time limit for the Committee to review an application. Defendant responds by noting that the Zoning Administrator must follow specific guidelines and submit the application to the Committee within 30 days of the application. Defendant has not shown, however, that the Committee's discretion is restricted by any applicable standard or time deadline. *See FW/PBS,* 493 U.S. at 227, 110 S.Ct. 596 (scheme that fails to set reasonable time limits on decisionmaker creates risk of indefinitely suppressing permissible speech); *ACORN v. City of Tulsa,* 835 F.2d 735, 741 (10th Cir.1987) (city officials' intuitive judgment, however well exercised, is insufficient standard to determine permissibility of First Amendment activities). The Committee's practice of reviewing applications at its next monthly meeting is insufficient. First, the Development Committee only reviews applications at its next meeting; it is not required to make a decision at the meeting. Second, defendant has not offered evidence .that this practice is "well-established." *See Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138. Finally, even if the Com-

mittee were required to act at the meeting, it has unfettered discretion to deny a permit application because no standards are set forth in the sign ordinance.[12]

For these reasons, Section 6–103(B)(2) of the Merriam Sign Ordinance is unconstitutional.

## III. Discretion of Zoning Administrator And Other City Officials

■ Section 6–103(F)(1) of the ordinance allows the Zoning Administrator to remove signs if he finds them "unattractive" or a "menace to the public." The ordinance does not explicitly define these terms. Plaintiff contends that the ordinance effectively grants the Zoning Administrator unfettered discretion to remove signs based on his own sense of attractiveness. Defendant responds that the Zoning Administrator's discretion is limited by a separate provision of the ordinance which requires that all signs conform with the aesthetics of the immediate area.

After carefully reviewing the ordinance and pertinent amendments, the Court finds that the Zoning Administrator may remove a sign either if he or she finds that it is unattractive, Section 6–103(F)(1), or that it does not conform to the aesthetics of the surrounding area, § 6–104(I). Nowhere does the ordinance link the two prohibitions. Defendant has offered no authority in support of an undefined attractiveness standard in a sign permit scheme. As explained above, the legislature must place limits on the administrator's authority either by explicit "textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138. Pursuant to Section 6–103(F)(1) of the ordinance, the Zoning Administrator has extremely broad discretion

12. Defendant notes that applicants are not required to disclose the content of their proposed sign. Applicants are required, however, to disclose their names, addresses and telephone numbers, as well as certain struc-

tural information regarding the sign. Moreover, in order to show that the proposed sign meets one of the functional types permitted by the ordinance, the applicant must reveal the content of the proposed sign.

to deny a permit for or to remove a sign that he or she finds unattractive. The City of Merriam has not placed any limits on that discretion. Accordingly, the Court finds that Section 6–103(F)(1) of the Merriam ordinance is unconstitutional. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (licensing scheme may not delegate overly broad licensing discretion to government official); *ACORN v. City of Tulsa*, 835 F.2d at 741 (intuitive judgment, however well exercised, is insufficient standard for First Amendment activities).

As discussed above, Section 6–104(I) requires that "all signs shall conform, generally, to the aesthetics of the immediate area in which they are placed." The ordinance does not define "aesthetics" or explain how city officials are to determine if a sign conforms to the aesthetics of the immediate area in which it is placed. City officials effectively have unbridled discretion to deny a permit application based on the aesthetics of the surrounding area. *See Metromedia*, 453 U.S. at 510, 101 S.Ct. 2882 ("esthetic judgments are necessarily subjective, defying objective evaluation"); *United Food & Comm. Workers Union v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 360 (6th Cir.1998) ("aesthetically pleasing" requirement invites arbitrary enforcement); *City of Moreno Valley*, 103 F.3d at 818–19 (city officials had unbridled discretion in determining whether a sign is harmful to "aesthetic quality"). Therefore, the Court also finds that Section 6–104(I) of the ordinance is also unconstitutional.

Next, plaintiff contends that the ordinance is vague and overbroad because it prohibits signs containing "any obscene, indecent or immoral matter" without defining these terms. *See* Merriam Sign Ordinance § 6–104(H). The Zoning Administrator determines if a sign complies with this requirement. *See id.* §§ 6–103(A)(11), (B), (F). In *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court held:

State statutes designed to regulate obscene materials must be carefully limited. *See Interstate Circuit, Inc. v. Dallas*, 390 U.S. [676,] 682–85, 88 S.Ct. 1298, 20 L.Ed.2d 225 [ (1968) ]. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed.

*Id.* at 23–24, 93 S.Ct. 2607. Defendant argues that the definitions of obscene, indecent and immoral have been adequately developed by case law. Defendant fails to show, however, that the varying definitions which the courts have adopted are binding on the Zoning Administrator. *See, e.g., Miller, supra; State v. Great Am. Theatre Co.*, 227 Kan. 633, 640, 608 P.2d 951, 956 (1980) (affirming jury instruction on definitions of "obscene" and "prurient interest"); *see also State v. Motion Picture Entitled "The Bet"*, 219 Kan. 64, 547 P.2d 760, (1976) (construing word "obscene" in state laws as term of constitutional meaning and setting forth standards of *Miller*). The ordinance does not reference any of the cases referred to in defendant's briefing, however, and no Kansas court has construed the ordinance reference to obscene, indecent or immoral material.

Absent specific definitions of the terms obscene, indecent and immoral, the Court must find that Section 6–104(H) of the ordinance is unconstitutional. The provision is vague because it does not set forth explicit standards to provide fair warning of the types of signs which are prohibited. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (enactment is void for vagueness if prohibitions are not clearly defined); *Solomon v. City of Gainesville*, 763 F.2d 1212, 1213 (11th Cir.1985) (finding unconstitutionally vague an ordinance which prohibited signs displaying "any statement, word, character or illustration of an obscene, indecent or immoral nature"); *Union City*, 467 S.E.2d at 883) (finding unconstitution-

ally vague an ordinance which prohibited signs containing "statements, words or pictures of an obscene, indecent· or immoral character such as will offend public morals"). The provision is overbroad because its undefined terms necessarily reach both constitutionally protected and unprotected speech. *See Grayned,* 408 U.S. at 114, 92 S.Ct. 2294; *Solomon,* 763 F.2d at 1213 (also finding ordinance overbroad) (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 612–13, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); *Union City,* 467 S.E.2d at 883 (same).

Defendant claims that the Kansas legislature has itself prohibited "obscenity" and that the statute has been upheld as valid. *See* K.S.A. § 21–4301 et seq.; *State v. Baker,* 11 Kan.App.2d 4, 711 P.2d 759 (1985). In *Baker,* however, the Kansas Supreme Court held that the statute was not vague or overbroad because it expressly incorporated the standards of *Miller v. California. See Baker,* 11 Kan.App.2d at 10–11, 711 P.2d at 765. Moreover, the statute in *Baker* was a criminal one, such that a jury had to decide obscenity according to applicable law. Here, the City of Merriam has not incorporated the standards of *Miller v. California* and the Zoning Administrator, not a jury, decides whether a sign has obscene subject matter. For these reasons, the Court concludes that Section 6–104(H) of the ordinance is unconstitutional.

### IV. Regulatory Takings Claim

 Plaintiff alleges that the ordinance works an unconstitutional taking of property without due process in violation of the Fourteenth Amendment. Although defendant did not raise the argument, the Court finds that plaintiff's claim is not ripe for review. The Supreme Court has held that "a property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State for obtaining such compensation." *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Al-

though plaintiff has raised a facial challenge to the provision which terminates nonconforming signs, it must first establish that it has unsuccessfully sought compensation under the inverse condemnation procedures of Kansas or that such procedures would be futile. *See id.* at 195–97, 105 S.Ct. 3108; *Levald, Inc. v. City of Palm Desert,* 998 F.2d 680, 686 (9th Cir. 1993); *see also National Advertising,* 912 F.2d at 413–14 (claim that ordinance rendered plaintiff's billboard leasehold interests worthless not ripe). Even if the Court assumes that the City ordinance has rendered plaintiff's billboards worthless, no taking for constitutional purposes has occurred "unless or until the State fails to provide an adequate postdeprivation remedy for the property loss." *Williamson County,* 473 U.S. at 195, 105 S.Ct. 3108 (quoting *Hudson v. Palmer,* 468 U.S. 517, 532 n. 12, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). For this reason, plaintiff's takings claim is dismissed as unripe.

### V. Severability Of Merriam Sign Ordinance

 The severability of a local ordinance is a question of state law. *See Lakewood,* 486 U.S. at 772, 108 S.Ct. 2138. The Kansas Supreme Court has stated the test as follows:

> Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. Whether the legislature had provided for a severability clause is of no importance. This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent.

*Thompson v. K.F.B. Ins. Co.,* 252 Kan. 1010, 1023, 850 P.2d 773 (1993) (quoting *Felten Truck Line v. State Board of Tax Appeals,* 183 Kan. 287, 300, 327 P.2d 836 (1958)).

The Court has held that numerous provisions of the Merriam sign ordinance are unconstitutional. *See supra* (§§ 6–103(B)(2), 6–103(F)(1), 6–104(H), 6–104(I), 60104(N), 6–105, 6–201, 6–201, 6–202 and 6–203 unconstitutional). After carefully reviewing the entire ordinance, the Court finds that it would not have passed without these provisions. If these provisions are removed, the legislature's intent would be significantly undermined. *See* Sign Ordinance § 101 (one purpose is to prohibit all forms of off-premise signs). These provisions cannot be severed without materially changing the structure and purpose of the entire ordinance. For these reasons, the Court strikes the entire ordinance.

**IT IS THEREFORE ORDERED** that *Plaintiff's Motion For Summary Judgment* (Doc. # 13) filed March 1, 1999, be and hereby is **OVERRULED** with respect to plaintiff's takings claim and **SUSTAINED** with respect to plaintiff's remaining claims.

**IT IS FURTHER ORDERED** that *Defendant's Cross Motion For Summary Judgment* (Doc. # 19) filed April 8, 1999, be and hereby is **SUSTAINED** with respect to plaintiff's takings claim and is **OVERRULED** with respect to plaintiff's remaining claims.